UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

JOSEPH WAYLON DABBS,

               Petitioner,

vs.                              Case No. 3:03-cv-953-J-12MCR

JAMES V. CROSBY, JR., et al.,

               Respondents.

_____

**ORDER**

**I. Status**

Petitioner, an inmate of the Florida penal system who is represented by counsel, initiated this action by filing a Petition for Writ of Habeas Corpus (Doc. #1) pursuant to 28 U.S.C. § 2254 on November 7, 2003.  He is proceeding on a Second Amended Petition (Doc. #17), in which he challenges his state court (Hamilton County) conviction for three counts of possession of a controlled substance and one count of possession of drug paraphernalia.

In ground one, Petitioner contends that his conviction was obtained by use of evidence gained pursuant to an unconstitutional search and seizure and that the state did not provide a full and fair hearing on the merits of his Fourth Amendment claim.  In

ground two, Petitioner asserts that he received ineffective assistance of appellate counsel for counsel's failure to raise the following issue on appeal: that the search of Petitioner's vehicle violated the Fourth Amendment because Petitioner's detention "was illegal once the detention unnecessarily continued after the officer had resolved the suspicion for the initial stop and determined that Dabbs was not driving under the influence, and that Dabbs's subsequent 'consent' came during this period of illegal detention and as such was invalid due to the taint of the illegal detention." Petitioner Dabbs's Supplemental Memorandum of Law in Support of Amended 2254 Petition (Doc. #19) (hereinafter Petitioner's Memorandum), filed July 8, 2004, at 2.

On October 5, 2004, Respondents filed an Answer to Second Amended Petition for Writ of Habeas Corpus (Doc. #24) (hereinafter Response). Petitioner Dabbs's Reply to State's Answer to Second Amended Petition Under 28 U.S.C. § 2254 (Doc. #29) was filed on March 7, 2005. This case is now ripe for review.

## II. Relevant Procedural History[1]

On August 18, 2000, Petitioner was charged by amended information with the following offenses: Count I, possession of a controlled substance (methylenedioxymethamphetamine) (hereinafter MDMA) in excess of ten grams; Count II, possession of a controlled

---

[1] The Court will omit the irrelevant procedural history since Respondents agree that this action was timely filed.

2

substance (Alprazolam), with intent to sell, manufacture or deliver said controlled substance; Count III, possession of a controlled substance (Diazepam), with intent to sell, manufacture or deliver said controlled substance; Count IV, possession of a controlled substance (Hydrocodone), with intent to sell, manufacture or deliver said controlled substance; Count V, possession of a controlled substance (cannabis) in excess of twenty grams; Count VI, possession of a controlled substance (hashish); and, Count VII, possession of drug paraphernalia.  Ex.[2] A.

On September 28, 2000, Petitioner's defense attorney filed a motion to suppress, which states, in pertinent part, the following:

> THE DEFENDANT, JOSEPH DABBS, by and through his undersigned counsel and pursuant to Florida Rule of Criminal Procedure 3.190(h), respectfully moves this Honorable Court to suppress the evidence enumerated below as the product of an unreasonable search and seizure:
>
> The instant motion is based on the following statement of facts:
>
> 1.  On May 26, 2000, Deputy T.L. Griffin, Hamilton County Sheriff's Department stopped the defendant's vehicle based on an alleged "Be On the Look Out" the agency received from the Florida Highway Patrol and after Deputy Griffin allegedly observed the vehicle's tires drift over the middle lane two times.

---

[2] The Court hereinafter refers to the Respondents' exhibits as "Ex." Exhibits A through O are contained in the Exhibits to State's Response to Petition for Writ of Habeas Corpus (Doc. #10).  Exhibits P and Q are appended to Respondents' Response (Doc. #24).

2.    After stopping the defendant's vehicle, Deputy Griffin made contact with the defendant, the driver of the vehicle.  The stop of the Defendant was videotaped and portions of the conversation were recorded.

3.    Upon making contact with the Defendant, Deputy Griffin questioned him regarding his direction of travel and advised him why he had been stopped.

4.    During the course of the traffic stop and prior to the search of the Defendant's vehicle, Deputy Griffin had the Defendant perform the Horizontal Gaze Nystagmus test.  Per Deputy Griffin's written report the Defendant passed the test.  During deposition testimony the Deputy testified that the test showed the Defendant was under the influence of drugs or provided enough of a basis for the Deputy to suspect such.

5.    During further questioning of the Defendant, Mr. Dabbs opened his trunk and allowed Deputy Griffin to look inside it.  Said "consent", at that time, did not extend any further than the Deputy being allowed to look in the Defendant's trunk.  The search of the trunk revealed nothing.

6.    After looking through the trunk the Deputy questioned the Defendant as to where his clothes were, to which the Defendant replied "in my bag".  Deputy Griffin then questioned the Defendant as to where his bag was located.  Deputy Griffin and the Defendant progressed to the passenger side of the vehicle and [sic] where the Defendant unlocked the passenger door.

7.    Deputy Griffin looked inside the vehicle and proceeded to question the Defendant regarding the damaged radio in the car.  Rental papers were provided to the officers to substantiate that the vehicle had just been rented.

8. After said discussion, the Defendant removed a duffle bag from the vehicle and advised the officers that it contained just clothes and he shook the bag in front of the officers and then placed it back in the vehicle.

9. At that time the officers requested consent to look in the vehicle, to which the defendant advised "Call the dogs or anything you want, go ahead."

10. The Defendant at no time unequivocally consented to a search of the interior of the vehicle. Rather the Defendant repeatedly told law enforcement that he in fact objected to the officer looking into his vehicle and he did not consent to such an intrusive search of the car.

11. Notwithstanding the Defendant's repeated objections to the search being conducted, Deputy Griffin continued to search the vehicle without the requisite probable cause or without one of the valid exceptions to the search warrant requirement existing.

12. The actions and statements made by the defendant do [not] rise to a level of voluntary and knowing consent.

13. If the Court were to believe the Defendant initially granted consent to the Officers, such statements and actions by the Defendant acted as a withdrawal of said consent to a search and further placed a limit on the type and scope of the search.

14. The unlawful search of said vehicle resulted in the recovery of certain items, by the Hamilton County Sheriff's deputies, including: cannabis, MDMA, Alprazolam, Diazepam, Hydrocodone, Nalbuphine, plastic bags, glass jar, pipe, and syringe.

15. Prior to searching said vehicle the Hamilton County Sheriff's Department had no probable cause to justify said search, nor did

they possess a valid search warrant issued by
a neutral and detached magistrate.

16. Further the search of said vehicle
was not based on one of the valid exceptions
to the search warrant requirement,
specifically, the warrantless search of the
vehicle was not predicated upon a search
incident to lawful arrest, a search based upon
probable cause, a search based upon an
emergency situation or a search based upon
voluntary consent.

The following grounds are asserted in
support of the foregoing motion:

The aforementioned evidence was illegally
seized without a warrant pursuant to an
unreasonable search and seizure in violation
of the defendant's rights guaranteed by the
Search and Seizure Clause of the Fourth
Amendment to the United States Constitution
and the Due Process Clause of the Fourteenth
Amendment to the United States Constitution,
and Article I, Section 12, of the Florida
Constitution (1968).

Ex. D at 1-3.

On October 5, 2000, the trial court held a hearing on the

motion. Thomas L. Griffin, Jr., was the state's first witness. He

testified that on May 26, 2000, he received a "bolo" (be on the

lookout) alert regarding a possible drunk driver in a vehicle

headed north on Interstate 75. Ex. E1[3] at 6. Deputy Griffin "made

contact" with the suspect at approximately 4:00 a.m., activated his

---

[3] The first 101 pages of Ex. E is the transcript of the October 5,
2000, hearing on the motion to suppress. The Court will hereinafter
refer to this portion of Ex. E as "Ex. E1." The remainder of Ex. E is
the transcript of a November 6, 2000, hearing on the motion to suppress.
The Court will hereinafter refer to this portion of Ex. E as "Ex. E2."
The Court will cite the page numbers inscribed on the upper right hand
corner of these transcripts.

blue lights, and pulled over the suspect's car.  Id. at 6-7, 28.

Before stopping the suspect, Deputy Griffin observed the suspect's

car crossing the left lane twice; therefore, the deputy was

concerned that the driver was either "drunk or tired."  Id. at 7.

When the deputy turned on his blue lights, the video camera in

his patrol car activated.  Id.  Therefore, the subsequent events

were videotaped.  Deputy Griffin testified that the videotape

fairly and accurately represented the events of that morning.  The

videotape was admitted into evidence.  Id. at 7-8.

As Deputy Griffin pulled over the suspect, he relayed the

license number of the car, and was informed that the vehicle had

been reported as abandoned in Fort Lauderdale.  Id. at 9-10.

Therefore, Deputy Griffin was "investigating the abandoned car

along with the other circumstances that were going on in this

case[.]"  Id. at 49.

Deputy McDaniel arrived in a separate patrol car to assist

Deputy Griffin.  Id. at 28.  Both deputies were wearing their

uniforms.  Id. at 29.  Both deputies were armed.  Id.  Deputy

Griffin stated that his height was six feet, two inches, and his

weight was between 285 and 290 pounds.  Id. at 38-39.

Deputy Griffin told the Petitioner why he had pulled over his

car.  Id. at 9.  He asked him if he was "headed back to Tennessee

because the tag was a Tennessee tag."  Id.  The Petitioner told

Deputy Griffin that he had been driving from Boca Raton and was

going to Ocala, Gainesville and Lake City.  <u>Id</u>. at 9-10, 44.
However, when he was pulled over, he was traveling north, away from
these locations.  <u>Id</u>. at 11.  He was approximately thirty minutes
past Lake City, an hour past Gainesville and an hour and thirty
minutes past Ocala.  <u>Id</u>.

The Petitioner volunteered to take the horizontal gaze
nystagmus test.  <u>Id</u>.  Deputy Griffin, who had been trained to
conduct this procedure and had administered it approximately sixty
to eighty times, then performed the test.  <u>Id</u>. at 12.  He observed
the Petitioner's eyes "slightly jerking when [the deputy] was going
up-and-down with [his] pen."  <u>Id</u>.  This sort of movement indicated
that the Petitioner was under the influence of some drug, but not
alcohol.  <u>Id</u>. at 12-13.  Deputy Griffin "believed that he was not
impaired enough to be taken off the road for driving," but the test
"did indicate that something was wrong."  <u>Id</u>. at 13.  Nevertheless,
Deputy Griffin stated in his police report that Petitioner had
passed the test.  <u>Id</u>. at 27.  He did not note the jerking of
Petitioner's eyes in his police report, nor did he indicate that
Petitioner appeared to be under the influence of drugs.  <u>Id</u>.

The Petitioner volunteered to show Deputy Griffin the contents
of the trunk of his car; however, there was nothing but trash in
the trunk.  <u>Id</u>. at 13.  Deputy Griffin asked Petitioner where his
clothes were, and Petitioner replied that the clothes were in the
front of the car.  <u>Id</u>.  Petitioner voluntarily removed a duffel bag

from the passenger seat of the car and showed it to Deputy Griffin by tossing the bag in the air several times.  Id. at 14.  Deputy Griffin thought that this behavior was somewhat odd.  Id.

At this time, Deputy Griffin observed the interior of the car and noted "that someone had tried to pry the tape deck from the dash board."  Id.  Deputy Griffin saw a screw driver in the car. Id. at 15.  Deputy Griffin had been a deputy for six years, had made approximately 100 drug arrests[4] and, based upon his experience, he knew that drugs are commonly hidden behind the tape deck in a car.  Id. at 19-21.  At first, Deputy Griffin thought that the vehicle was stolen, but then Petitioner produced paperwork showing that he had rented the car.  Id. at 21.  Petitioner appeared to be nervous.  Id.

Before conducting any search, Deputy Griffin had been informed by the dispatch officer that the Petitioner had previously been arrested for a drug offense in Texas.  Id. at 15-16.  Deputy McDaniel asked the Petitioner if he had ever been in any trouble, and Petitioner said that he had not.  Id. at 15.

At this point, Deputy Griffin asked Petitioner for permission to search the car.  Id. at 16.  Specifically, he said, "you mind if we take a look."  Id. at 34.  Petitioner replied, "You can call the dogs or do whatever you want."  Id. at 16.  Deputy Griffin said,

---

[4] Deputy Griffin also stated that he and other deputies had made "lots of drug arrests" on Interstate 75.  Ex. E1 at 20.

"And do whatever I want?" Id. The Petitioner replied affirmatively. Id. Deputy Griffin then searched the car. Id. at 17. Petitioner never asked Deputy Griffin to stop the search. Id. While he was searching the car, Deputy Griffin could not hear what, if anything, Petitioner was saying to Deputy McDaniel. Id. at 35-36.

Deputy Griffin found a small amount of marijuana in a cup-holder that extended from the console between the seats. Id. at 17, 36, 48, 50. At this point, Deputy Griffin arrested the Petitioner. Id. at 17. After placing him under arrest, Deputy Griffin continued to search the car and found two plastic bags of pills wrapped in a jacket that was in a duffel bag. Id. at 18. He had not specifically asked the Petitioner for permission to look inside the duffel bag. Id. at 36. Deputy Griffin then transported the Petitioner to jail and Deputy McDaniel conducted an inventory search of the car. Id. at 18. On the way to the jail, Petitioner told Deputy Griffin that the pills he had found were diet pills. Id. at 22.

During cross-examination, Deputy Griffin stated that he did not think Petitioner was free to leave the scene at the time that Deputy Griffin asked Petitioner for consent to search because the deputy was waiting for a response from a request the officers had previously submitted. Id. at 32. However, prior to finding the marijuana during the search of the car, Deputy Griffin never told

the Petitioner that he was under arrest or that he was not free to leave. Id. at 37. Deputy Griffin never told Petitioner that he did not have to consent to the search of his vehicle. Id.

Deputy Griffin never threatened to beat the Petitioner; however, he jokingly said he ought to beat the Petitioner for general purposes after Petitioner told Deputy Griffin that he was a stockbroker. Id. at 38. Deputy Griffin never advised Petitioner of his rights. Id. at 45-46. He never witnessed Deputy McDaniel "read him his rights at the scene" either. Id. at 46.

Deputy Timothy Allen McDaniel testified next for the state at the hearing. He heard Deputy Griffin ask Petitioner for consent to search the car and heard the Petitioner respond, "go ahead and call the dogs, do whatever." Id. at 52. While Deputy Griffin searched the car, the Petitioner told Deputy McDaniel that he could "call the dogs or do whatever[,]" that he worked for a lawyer and that he was a hard worker. Id. at 52-53. He told Deputy McDaniel that he thought Deputy Griffin was being rude, but he never told Deputy McDaniel or Deputy Griffin to stop the search. Id. at 53. Deputy McDaniel asked if he could search the Petitioner's pockets, and the Petitioner agreed. Id. at 56-57.

Deputy McDaniel never told the Petitioner the purpose of the search of the car or that he had the right to refuse the search. Id. at 55. He never advised the Petitioner of his rights. Id. Deputy McDaniel said that the Petitioner was not free to leave

during Deputy Griffin's search.  _Id_. at 55-56.  Deputy McDaniel did not think that Petitioner ever withdrew his consent to search the car.  _Id_. at 64.

The defense called the Petitioner to testify next.[5]  He said that after he was pulled over, the police officer asked him to step out of his car and proceed to the back of his car.  _Id_. at 71-72. Petitioner complied with this request.  _Id_. at 71.  The officer asked Petitioner where he was going, and the Petitioner told him that he was going to see his girlfriend who went to school in Gainesville and was currently living in Lake City.  _Id_. at 73.

The officer asked Petitioner if he could look into the vehicle, and the Petitioner responded, "'If you must, call the dogs, do whatever you need to do'" referring to get a warrant, call the dogs.  Do whatever you need to do to make it proper to go in there."  _Id_. at 75.

After Deputy Griffin started searching his car, the Petitioner told Deputy McDaniel that he did not want Deputy Griffin in his car.  _Id_. at 77.  Petitioner said, "why is he doing that, it's rude, I did not say he could do that.  I said he could do whatever

---

[5] For reasons that will hereinafter be explained, the only issue that the Court will address with respect to the search and seizure is whether the circumstances here gave rise to a reasonable suspicion of criminal activity that would justify the continued detention of Petitioner after the deputies determined he was not intoxicated.  Thus, the Court will omit the testimony of Petitioner that is not relevant to the question of whether the deputies had a particularized and objective basis for suspecting Petitioner of other illegal activity beyond the reported driving while intoxicated offense.

he needed to do to get a police warrant or get a dog." Id.  He told Deputy McDaniel to "get a dog or a warrant 10 times or 12 times." Id. at 78.  Deputy McDaniel then told Petitioner to "shut the hell up[.]" Id.  Petitioner told Deputy McDaniel that what they were doing was wrong, and "ask[ed] him to stop." Id.

On cross-examination, Petitioner admitted that he gave differing answers when questioned about his destination, saying that he was going to Ocala, Gainesville and Lake City. Id. at 83. He admitted that he told the officers that he had never been in trouble even though he had previously been arrested for possession of marijuana in Texas. Id. at 84-85.  He admitted that he bounced the duffle bag up and down when he showed it to the officers. Id. at 86.  He also agreed that he had told the officers that the bag contained only clothes even though there were 1,995 ecstacy pills in the bag as well. Id. at 86-87.  He admitted that he told the officer that there was nothing in the car that should not be there. Id. at 88.  Petitioner was permitted to testify further at a November 6, 2000, hearing, where the judge also heard argument on the motion. See Ex. E2.[6]

---

[6] At the November 6, 2000, hearing, defense counsel asked the court to allow Petitioner to clarify his previous testimony.  Although Petitioner admitted during the October 5, 2000, hearing that the duffle bag belonged to him, he wished to testify that the bag did not belong to him.  The trial court did not permit this testimony.  Petitioner's testimony at the November 6, 2000, hearing was limited to discussion of photographs of a vehicle that was similar to the car that was searched.

As noted previously, the videotape of the traffic stop was admitted into evidence.  The relevant portions of the transcript of that tape are as follows:[7]

DEPUTY GRIFFIN: How you doing?

THE DEFENDANT: All right.  I really didn't think I was speeding.

DEPUTY GRIFFIN: I really didn't think you were speeding either.  Step out of the car for me. Step back to the front of my car.

THE DEFENDANT: Okay.

DEPUTY GRIFFIN: All right.  Hey, run him for me.  Well, the reason I stopped you, we've been getting a lot of complaints about your driving.

THE DEFENDANT: (Inaudible) tired.

DEPUTY GRIFFIN: Yeah, yeah, you were driving when I got behind you like you were a little tired, also.

THE DEFENDANT: I didn't think I was.  Was I swerving?

DEPUTY GRIFFIN: Yeah, you went over that line right there twice before I put my lights on you.

THE DEFENDANT:  Where is the nearest rest area, or --

DEPUTY GRIFFIN: You just passed the exit right there.

THE DEFENDANT:  I guess I am tired.

_____

[7] The Court has copied the transcript verbatim, except where changes are noted in brackets.  The Court has not attempted to correct grammatical errors.

DEPUTY GRIFFIN: How far you been driving?

THE DEFENDANT: (Inaudible.)

DEPUTY GRIFFIN: Since where?

THE DEFENDANT: Boca.

DEPUTY GRIFFIN: Boca Raton?  Where you headed, back to Tennessee?

THE DEFENDANT: No, sir, Gainesville.

DEPUTY GRIFFIN: You headed to Gainesville?

THE DEFENDANT: Um-hum.

DEPUTY GRIFFIN: Gainesville, Georgia?

THE DEFENDANT: No, Gainesville, Florida.

DEPUTY GRIFFIN: Well, you about an hour past Gainesville, Florida.

THE DEFENDANT: I know -- I know that, too. That's where my girlfriend goes to school.

DEPUTY GRIFFIN: Well, if you going to Gainesville, Gainesville is an hour that way.

THE DEFENDANT: I know, but she lives this way. It's still about another --

DEPUTY GRIFFIN: Where she live at?

THE DEFENDANT: Ocala -- Lake City --

DEPUTY GRIFFIN: Your girlfriend lives in Ocala?

THE DEFENDANT: No, [L]ake [C]ity. (Inaudible.) I went to far?

DEPUTY GRIFFIN: Yeah, you done went to far. You must have been asleep.

THE DEFENDANT: (Inaudible.) must have been.

DEPUTY GRIFFIN: Cause they got like five signs out there -- five signs for [L]ake City.

THE DEFENDANT: I know where that is, too.  I'm sorry.  I'll take any test you want me to take, or anything.

DEPUTY GRIFFIN: You sure?

THE DEFENDANT: Positive.

DEPUTY GRIFFIN: All right.  Stand with your back toward the road.

THE DEFENDANT: Okay.

DEPUTY GRIFFIN: Just like that.  Step out from my car, some.

THE DEFENDANT: All right.

DEPUTY GRIFFIN: One easy test.

THE DEFENDANT: All right.

DEPUTY GRIFFIN: I'm gonna move this pen, left, right, up and down.

THE DEFENDANT: Okay.

DEPUTY GRIFFIN: Keep your eyes on the pen without moving your head; do you understand that?

THE DEFENDANT: Got it.

DEPUTY GRIFFIN: What do you do for a living?

THE DEFENDANT: Well, right now I'm a student. I used to be a stockbroker.  I'm trying to get my masters in education.

DEPUTY GRIFFIN: You used to be a stockbroker?

THE DEFENDANT: Used to be.

DEPUTY GRIFFIN: We ought to beat you up just for the general purpose then.

THE DEFENDANT: No, no, no.

DEPUTY GRIFFIN: All right.  I'm gonna move it to my right, to my left --

THE DEFENDANT: Okay.

DEPUTY GRIFFIN: -- up and down, either way, do not move your head.

THE DEFENDANT: Got it.

DEPUTY GRIFFIN: (Indicating.)

THE DEFENDANT: One time I did this test in Gatlinburg cause I was going 30 miles an hour in a 55 cause it was road construction and I didn't see the sign.  That was the only other time I ever did this.

DEPUTY GRIFFIN: Well, if you a stockbroker and you can't see, man, you can't see them little numbers, can you?

THE DEFENDANT: That's the reason I had to get out of it.

DEPUTY GRIFFIN: Yeah, had to be.  Well, he's running a check on you now.  But like I say, Lake City is that way, Gainesville is that way.

THE DEFENDANT: Gainesville is that way.

DEPUTY GRIFFIN: You go about 19 miles that way, you'll be in Georgia.

THE DEFENDANT: I'll be definitely in trouble with my girlfriend.  I am tired, I guess. Thank you.  Sorry about all the -- (inaudible) busy weekend.

DEPUTY GRIFFIN: Yeah.

THE DEFENDANT: Get the terrible drivers off the road.

UNIDENTIFIED MALE DEPUTY: What's your girlfriend's name.

THE DEFENDANT: Lisa, Lisa -- Lisa Arviso.

UNIDENTIFIED MALE DEPUTY: Where she's at?

THE DEFENDANT: She's in Gainesville/Lake City.

DEPUTY GRIFFIN: She's in Gainesville/Lake City.

THE DEFENDANT: No, she's in Lake City, she goes to school in Gainesville.

DEPUTY GRIFFIN: What, she go --

UNIDENTIFIED MALE DEPUTY: Gainesville (inaudible.)

THE DEFENDANT: How do I say Gainesville?

UNIDENTIFIED MALE DEPUTY: What's in Gainesville?

THE DEFENDANT: University of Florida.

UNIDENTIFIED MALE DEPUTY: Why do you keep talking about Gainesville?

THE DEFENDANT: That's where you asked me to go (inaudible.)

DEPUTY GRIFFIN: No, I did not ask you to go there.  I said where was you going.

THE DEFENDANT: Where was I going.  Yeah.

UNIDENTIFIED MALE DEPUTY: You ever been in trouble before?

THE DEFENDANT: No, not at all.  Not one bit. Not one bit.  I'll even pop open my trunk. That's what I thought you wanted me to do in the first place when I came out here.

DEPUTY GRIFFIN:  All right, pop it open then.

18

THE DEFENDANT: (Indicating.)

DEPUTY GRIFFIN: You ain't got no weapons, or anything?

THE DEFENDANT: (Inaudible.)

DEPUTY GRIFFIN: What is that?

THE DEFENDANT: An (inaudible) shampoo.  Steak-in-shake.

DEPUTY GRIFFIN: That's just trash?

THE DEFENDANT: That's just trash?

DEPUTY GRIFFIN: So where your clothes at?

THE DEFENDANT: In my bag.

DEPUTY GRIFFIN: Where's your bag?

THE DEFENDANT: Right here (indicating.)

DEPUTY GRIFFIN:  What you do with the screwdriver?

THE DEFENDANT: Nothing.

DEPUTY GRIFFIN: It's not your screwdriver?

THE DEFENDANT: Oh, no, it's my screwdriver. (Inaudible) it's not a tool, I'm sure.

DEPUTY GRIFFIN: What happened to the -- the --

THE DEFENDANT: That's because it's cheaper. They're usually $240 a week, mine is only $189.  As you see I paid it today and extended it.

DEPUTY GRIFFIN: Well, what happened to the -- the tape deck?

THE DEFENDANT: That's the way it was when I got it.  See, I renewed that thing today cause it was old.  It's to June 2nd.  I paid for it today (inaudible.)

DEPUTY GRIFFIN: What you got in your bag? What you got in your bag?

THE DEFENDANT: Just my clothes.  Just my clothes.  (Indicating.)

DEPUTY GRIFFIN: All right.  Step back to the rear of the car for me.

THE DEFENDANT: Okay.

UNIDENTIFIED MALE DEPUTY:  There ain't nothing in that car, that shouldn't be, right?

THE DEFENDANT: No, sir.

DEPUTY GRIFFIN: You sure?

THE DEFENDANT: I'm positive.

DEPUTY GRIFFIN: You got -- you mind if we take a look?

THE DEFENDANT: (Inaudible.)

DEPUTY GRIFFIN: Huh?

THE DEFENDANT: You can, yeah.  (Inaudible) I just opened the car.

DEPUTY GRIFFIN: It's a -- hey --

THE DEFENDANT:  You can call the dogs, or anything you want.  Go ahead.

DEPUTY GRIFFIN: Anything we want.  Go ahead, right?

THE DEFENDANT: I mean, yeah, that's fine.

UNIDENTIFIED MALE DEPUTY: (Inaudible.)

THE DEFENDANT: Yeah.

UNIDENTIFIED MALE DEPUTY: (Inaudible) car.

THE  DEFENDANT:  (Inaudible)  he  asked  me (inaudible.)    I  said  call  the  dogs.

(Inaudible) call the dogs.  I think that's
very rude.

UNIDENTIFIED MALE DEPUTY: (Inaudible.)

THE DEFENDANT: No, can I -- (inaudible) you
want to call the dogs?

UNIDENTIFIED MALE DEPUTY: (Inaudible.)

DEPUTY GRIFFIN: Hey, there's marijuana all in
the -- armrest?

Transcript of Videotape, dated May 26, 2000, at 1-8.[8]

On November 13, 2000, the trial court held another hearing, at
which he ruled on the motion as follows:[9]

THE COURT:   This is in State versus
Joseph W. Dabbs, 00-65-CF.

We had a suppression motion last week and
the Court has had benefit of a video as well
as reading the transcript from the video or
the various exhibits and testimony of various
witnesses and argument of counsel.  And I have
gone over the case law since the argument was
given and I find that he did give a consent to
search and that it was freely and voluntary
without due duress.

The law enforcement officers at the time
that was there and there was some on the
videotape, but something was made of one of
the officers saying, you know, you are what, a
stockbroker, I ought to beat you right now
kind of thing.  It was very obviously a joke.
Everybody laughed about it.   There was no

---

[8] The videotape is the fourth exhibit and the transcript of the
videotape is the fifth exhibit submitted in Defendant-Petitioner Dabbs's
Appendix to Second Amended Petition for Habeas Corpus Relief Under 28
U.S.C. § 2254 (Doc. #18), filed July 8, 2004.

[9] Again, the Court has copied the transcript verbatim and has not
attempted to correct grammatical errors.

intimidation or duress or anything like that as later wanted to bring up. It was very obvious just a joking time out on the side of the road.

The actions of the defendant, the defendant was stopped and there was some call in of a drunk driver on the road and then said they seen him go several times in the left-hand lane and back and forth in there. It was more of a weaving. But when he was stopped, he even ran a roadside test and there was no indication of being intoxicated.

But when they called the tag in, it came back as an abandoned vehicle in Fort Lauderdale. They also were told of a previous arrest for a drug case in Texas. This was out on 1-75, which as we know everyone by far that goes through there is not drug cases, but it is an area where it is quite common as well to find drug violations. The abandoned vehicle turned out not to be abandoned. The thing in Texas, I don't take into account whether he was arrested or not, except that information came to law enforcement officers, so that was certainly reason to stop. There was reason then to ask to look into it first. I think the trunk of which the defendant said fine. I am going to look, you know, other ways in the truck -- in the vehicle. The defendant said: Sure, call the dogs. Do whatever you have to.

It was clearly a consent. Whether or not it was withdrawn later as the defendant wants to bring up later on the argument and on hearing the motion to suppress, there was never any clear withdrawal, if any withdrawal. He had some indication that he tried to say you shouldn't be doing this and those type things, but nothing is ever a clear withdrawal.

In the Havel, H-A-V-E-L, I believe it is spelled, it says the same as giving a clear withdrawal, the same is required to give clear consent. I did find it was clear consent.

The defendant is a college student, been
through that.  He is obviously an intelligent
young man from his appearance before me and
his testimony.   There is no indication of
anything that he did not understand his
consent that was given and understand his
rights.  And at the time, he was not under
arrest and not required at that time to be
giving or for them to outline his rights to
them.  He freely and voluntarily consented and
there was no clear withdrawal of it.

Once the consent was given -- well, as
they go into the interior of the vehicle,
there in plain view once it is consented and
once they have gone into it, was where they
discovered the marijuana, which at that time I
believe he was arrested and his rights read to
him then.    It was a small amount, but
certainly incident to arrest.   They have a
right to continue on if for no other reason
than consent was given and not withdrawn.
They go through further inspection of the
vehicle.

When they look into it, they find a tape
deck that's been tampered with, which was
obvious tampering.  That's not -- I mean, a
console, not a tape deck, but a center console
had been tampered with and there was actually
a screwdriver found in the vicinity.   It is
not uncommon at all for that to be areas where
drugs are hidden, so the fact that they wanted
to go further into that is understandable and
reasonable.

Going further in the inspection and there
was at the time when they did find the bag
with the pills, which turned out to be illegal
drugs inside, all of this was on -- the
beginning of it was on a video.  That inside
we could not see with the video, but
nevertheless there was nothing shown to be
contrary to what I said here today and I find
that it was a free and voluntary, knowingly
given consent without duress, that it was not
clearly withdrawn.   It meets the test -- let
me say, first of all, State v. Jones would be

> applicable and it is within that to go into
> the tape deck or center console, whatever it
> might be called.  As I was going through then
> and not withdrawing and find it was
> voluntarily, freely, no duress of a consent,
> so I, therefore, deny the motion to suppress.

Ex. F at 3-7.

On November 14, 2000, Petitioner entered into a plea agreement, in which he agreed to plead guilty to Counts I, V, VI and VII.  In return, the state agreed to enter a nolle prosequi with respect to Counts II, III and IV.  Petitioner reserved the right to appeal the trial court's denial of his motion to suppress. Ex. B.

On appeal, Petitioner's appellate attorney contended that the trial court's denial of Petitioner's motion to suppress constituted reversible error for the following reasons: (1) the state did not sustain its burden of proving that Petitioner consented to a search of the interior of his vehicle; (2) the state could not salvage its failure to obtain Petitioner's consent to search the vehicle by relying on Deputy Griffin's belated testimony that the marijuana was in plain view; (3) assuming arguendo that the state's evidence was sufficient to prove that Petitioner consented to the search, the state did not sustain its burden of proving that such consent was freely and voluntarily given; (4) assuming arguendo that Petitioner freely and voluntarily consented to the search of the vehicle, the trial court reversibly erred in ruling that Petitioner did not withdraw such consent; and, (5) the state failed to sustain

its burden of showing any circumstances, much less strong circumstances, justifying its warrantless search of the vehicle. Ex. J.  On April 11, 2002, the First District Court of Appeal per curiam affirmed the judgment of conviction, without issuing a written opinion.  Ex. M at 1.

In February of 2004, Petitioner filed petition for writ of habeas corpus in the First District Court of Appeal, raising the same ineffective assistance of appellate counsel claim he presents in ground two of the Second Amended Petition.  Ex. P.  The court denied the petition on March 24, 2004, stating only that "[t]he petition alleging ineffective assistance of appellate counsel is denied on the merits."  Ex. Q.

## III.  Evidentiary Hearing

A habeas corpus petitioner is entitled to an evidentiary hearing in federal court if he alleges facts which, if proven, would entitle him to habeas corpus relief.  Smith v. Singletary, 170 F.3d 1051, 1053-54 (11th Cir. 1999) (citation omitted); Cave v. Singletary, 971 F.2d 1513, 1516 (11th Cir. 1992) (citing Townsend v. Sain, 372 U.S. 293 (1963)).  Here, the pertinent facts of the case are fully developed in the record before the Court.  Smith, 170 F.3d at 1054 (stating that a district court does not need to conduct an evidentiary hearing "if it can be conclusively determined from the record that the petitioner was not denied effective assistance of counsel").  No evidentiary proceedings are

25

required in this Court.  See High v. Head, 209 F.3d 1257, 1263 (11th Cir. 2000) (citing McCleskey v. Zant, 499 U.S. 467, 494 (1991)), cert. denied, 532 U.S. 909 (2001).  The Court can "adequately assess [Petitioner's] claim[s] without further factual development."  Turner v. Crosby, 339 F.3d 1247, 1275 (11th Cir. 2003), cert. denied, 541 U.S. 1034 (2004).  Therefore, for the reasons set forth above, an evidentiary hearing will not be conducted by this Court.

### IV.  Standard of Review

On April 24, 1996, the President signed into law the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. 104-132, 110 Stat. 1214 (hereinafter AEDPA).  Since this action was filed after the effective date of AEDPA, the Court will analyze Petitioner's claim under 28 U.S.C. § 2254(d), as amended by AEDPA. Nelson v. Alabama, 292 F.3d 1291, 1294-95 (11th Cir. 2002), cert. denied, 538 U.S. 926 (2003); Fugate v. Head, 261 F.3d 1206, 1215 n.10 (11th Cir. 2001), cert. denied, 535 U.S. 1104 (2002); Wilcox v. Florida Dep't of Corr., 158 F.3d 1209, 1210 (11th Cir. 1998), cert. denied, 531 U.S. 840 (2000).

The Eleventh Circuit has described the standard of review under AEDPA and has explained:

> The Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this [action] and limits our review of the decisions of the state courts:

> A federal court may not grant a
> petition for a writ of habeas corpus
> to a state prisoner on any claim
> that has been adjudicated on the
> merits in state court unless the
> adjudication (1) resulted in a
> decision that was contrary to, or
> involved an unreasonable application
> of clearly established federal law,
> or (2) resulted in a decision that
> was based on an unreasonable
> determination of the facts in light
> of the evidence presented in state
> court.

Clark v. Crosby, 335 F.3d 1303, 1307-08 (11th
Cir. 2003) (citations omitted).  A general
framework of substantial deference governs our
review of every issue that the state courts
have decided:

> [A] state-court decision can be
> "contrary to" this Court's clearly
> established precedent in two ways.
> First, a state-court decision is
> contrary to this Court's precedent
> if the state court arrives at a
> conclusion opposite to that reached
> by this Court on a question of law.
> Second, a state-court decision is
> also contrary to this Court's
> precedent if the state court
> confronts facts that are materially
> indistinguishable from a relevant
> Supreme Court precedent and arrives
> at a result opposite to ours.
>
> . . .
>
> [A] state-court decision can
> involve an "unreasonable
> application" of this Court's clearly
> established precedent in two ways.
> First, a state-court decision
> involves an unreasonable application
> of this Court's precedent if the
> state court identifies the correct
> governing legal rule from this

27

> Court's cases but unreasonably
> applies it to the facts of the
> particular state prisoner's case.
> Second, a state court decision also
> involves an unreasonable application
> of this Court's precedent if the
> state court either unreasonably
> extends a legal principle from our
> precedent to a new context where it
> should not apply or unreasonably
> refuses to extend that principle to
> a new context where it should apply.

> Williams v. Taylor, 529 U.S. 362, 405-07, 120
> S.Ct. 1495, 1519-20, 146 L.Ed.2d 389 (2000).

Diaz v. Sec'y for the Dep't of Corr., 402 F.3d 1136, 1141 (11th

Cir. 2005).

The Eleventh Circuit addressed the application of the

"contrary to" clause in reviewing a state court adjudication:

> In applying the "contrary to" prong of
> AEDPA, we have recognized that where no
> Supreme Court precedent is on point, "we
> cannot say that the state court's conclusion
> . . . is contrary to clearly established
> Federal law as determined by the U.S. Supreme
> Court." McIntyre v. Williams, 216 F.3d 1254,
> 1258 (11th Cir. 2000).

Washington v. Crosby, 324 F.3d 1263, 1265 (11th Cir.), cert.

denied, 540 U.S. 965 (2003).

Under 28 U.S.C. § 2254(d)(2), this Court must determine

whether the state court's adjudication resulted in a decision that

was based on an unreasonable determination of the facts in light of

the evidence presented in the state court proceeding. Furthermore,

AEDPA "also directs that a presumption of correctness be afforded

factual findings of state courts, which may be rebutted only by

clear and convincing evidence.  <u>See</u> <u>id</u>. at § 2254(e)(1).  This presumption of correctness applies equally to factual determinations made by state trial and appellate courts."  <u>Bui v. Haley</u>, 321 F.3d 1304, 1312 (11th Cir. 2003) (footnote omitted) (citing <u>Sumner v. Mata</u>, 449 U.S. 539, 547 (1981)).

Finally, for a state court's resolution of a claim to be an adjudication on the merits, so that the state court's determination will be entitled to deference for purposes of federal habeas corpus review under AEDPA, all that is required is a rejection of the claim on the merits, not an opinion that explains the state court's rationale for such a ruling.  <u>Wright v. Sec'y for the Dep't of Corr.</u>, 278 F.3d 1245, 1255 (11th Cir. 2002), <u>cert</u>. <u>denied</u>, 538 U.S. 906 (2003).  <u>See</u> <u>Peoples v. Campbell</u>, 377 F.3d 1208, 1227 (11th Cir. 2004), <u>cert</u>. <u>denied</u>, 125 S.Ct. 2963 (2005).  Thus, to the extent that Petitioner's claims were adjudicated on the merits in the state courts, they must be evaluated under the new § 2254(d).

## V. Findings of Fact and Conclusions of Law

### A. Ground One

In ground one, Petitioner contends that his conviction was obtained by use of evidence gained pursuant to an unconstitutional search and seizure and that the state did not provide a full and fair hearing on the merits of his Fourth Amendment claim.  This Court is of the opinion that under the principles of <u>Stone v. Powell</u>, 428 U.S. 465 (1976), federal habeas review of Petitioner's

illegal search and seizure claim is not cognizable in this proceeding because Petitioner had a full and fair opportunity to litigate his Fourth Amendment issue in state court.

> [W]hen "the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search and seizure was introduced at his trial." Stone v. Powell, 428 U.S. 465, 494, 96 S.Ct. 3037, 3052, 49 L.Ed.2d 1067 (1976) (footnotes omitted). Thus, before [this Court] may review the merits of [Petitioner's] Fourth Amendment claim, [he] must demonstrate that the state courts deprived him of a full and fair opportunity to litigate the claim.
>
> In Tukes v. Dugger, 911 F.2d 508, 513-14 (11th Cir. 1990), [the Eleventh Circuit Court of Appeals] said this in applying Stone: "For a claim to be fully and fairly considered by the state courts, where there are facts in dispute, full and fair consideration requires consideration by the fact-finding court, and at least the availability of meaningful appellate review by a higher state court."

Peoples, 377 F.3d at 1224. The Eleventh Circuit has "construed Stone v. Powell to bar consideration of a Fourth Amendment claim if the state has provided an opportunity for full and fair litigation of the claim 'whether or not the defendant employs those processes.'" Huynh v. King, 95 F.3d 1052, 1058 (11th Cir. 1996) (citing Caver v. Alabama, 577 F.2d 1188, 1192 (5th Cir. 1978)) (footnote omitted).

As noted previously, the illegal search and seizure claim was raised in a pretrial motion to suppress, and the court heard

testimony on the motion.  The trial judge allowed both parties to present argument on the motion.  The court then provided a lengthy oral ruling on the motion.  This Court has reviewed the record of the suppression hearing and finds Petitioner had a full and fair opportunity to argue his Fourth Amendment claim in state court.  In addition, the illegal search and seizure claim was raised on direct appeal, and the trial court's decision with regard to this issue was affirmed.  Although the illegal search and seizure claim was not presented as a federal constitutional claim in Petitioner's direct appeal, Petitioner had the *opportunity* to advance the Fourth Amendment claim on direct appeal.  In sum, Petitioner was afforded every full and fair opportunity to litigate and have adjudicated his Fourth Amendment claim; therefore, under <u>Stone v. Powell</u>, he should not be permitted to further litigate the claim in this Court.  Thus, this ground is barred.

### B. Ground Two

In ground two, Petitioner asserts that he received ineffective assistance of appellate counsel.  In <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), the United States Supreme Court articulated a two-pronged test for determining whether a defendant was denied constitutionally adequate assistance of counsel.  "The same standard applies whether [a court is] examining the performance of counsel at the trial or appellate level."  <u>Eagle v. Linahan</u>, 279

F.3d 926, 938 (11th Cir. 2001) (citing <u>Matire v. Wainwright</u>, 811 F.2d 1430, 1435 (11th Cir. 1987)).

To demonstrate that his appellate counsel's performance was deficient, Petitioner must show that his attorney's performance "fell below an objective standard of reasonableness." <u>Strickland</u>, 466 U.S. at 687.  "In considering the reasonableness of an attorney's decision not to raise a particular claim, [a court] must consider 'all the circumstances, applying a heavy measure of deference to counsel's judgments.'" <u>Eagle</u>, 279 F.3d at 940 (quoting <u>Strickland</u>, 466 U.S. at 691). "Thus, '[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at that time.'" <u>Id</u>. (quoting <u>Strickland</u>, 466 U.S. at 689).  The reasonableness of counsel's assistance is reviewed in light of both the facts and law that existed at the time of the challenged conduct. <u>Chateloin v. Singletary</u>, 89 F.3d 749, 753 (11th Cir. 1996); <u>see also</u> <u>Jones v. United States</u>, 224 F.3d 1251, 1257-58 (11th Cir. 2000) (noting that counsel's "failure to divine" a change in unsettled law did not constitute ineffective assistance of appellate counsel) (quoting <u>Sullivan v. Wainwright</u>, 695 F.2d 1306, 1309 (11th Cir. 1983)).

To determine whether Petitioner was prejudiced by his attorney's failure to raise a particular issue, the Court "must

decide whether the arguments the [Petitioner] alleges his counsel failed to raise were significant enough to have affected the outcome of his appeal." United States v. Nyhuis, 211 F.3d 1340, 1344 (11th Cir. 2000) (citing Miller v. Dugger, 858 F.2d 1536, 1538 (11th Cir. 1988)), cert. denied, 531 U.S. 1131 (2001). "If [a court] conclude[s] that the omitted claim would have had a reasonable probability of success, then counsel's performance was necessarily prejudicial because it affected the outcome of the appeal." Eagle, 279 F.3d at 943 (citing Cross v. United States, 893 F.2d 1287, 1290 (11th Cir. 1990)).

Here, Petitioner asserts that he received ineffective assistance of appellate counsel because counsel failed to raise the following issue on appeal: that the search of Petitioner's vehicle violated the Fourth Amendment because Petitioner's detention "was illegal once the detention unnecessarily continued after the officer had resolved the suspicion for the initial stop and determined that Dabbs was not driving under the influence, and that Dabbs's subsequent 'consent' came during this period of illegal detention and as such was invalid due to the taint of the illegal detention." Petitioner's Memorandum at 2. This ineffective assistance of appellate counsel claim was rejected on the merits by the state appellate court.[10] Thus, there is a qualifying state

_____

[10] The First District Court of Appeal denied the petition in which this claim was raised, stating that "[t]he petition alleging ineffective assistance of appellate counsel is denied on the merits." Ex. Q.

court decision.  The Court must next consider the "contrary to" and "unreasonable application" components of the statute.  "It is the objective reasonableness, not the correctness per se, of the state court decision that we are to decide." Brown v. Head, 272 F.3d 1308, 1313 (11th Cir. 2001), cert. denied, 537 U.S. 978 (2002).

Upon a thorough review of the record and the applicable law, it is clear that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  Thus, Petitioner is not entitled to relief on the basis of this claim.

Additionally, this Court also finds this claim to be without merit.  As an initial matter, this Court is of the opinion that the issue was not preserved for appeal.  The issue was not raised in the written motion to suppress.  In the argument on the motion to suppress, defense counsel focused on the following issues: (1) whether the language used by Deputy Griffin was sufficient to constitute a request for a search and whether the language used by Petitioner was sufficient to convey a consent to search; (2) if so, whether the consent was voluntary; and, (3) if so, whether the consent was thereafter withdrawn.  See Ex. E2 at 21-34.  The following portion of the transcript reflects the only time that

defense counsel alluded to the argument Petitioner contends appellate counsel should have raised on appeal:

> In addition, Mr. Dabbs was detained at the scene of the traffic stop longer than was reasonable or necessary. After they conducted the horizontal gaze nystagmus, they determined that he wasn't under the influence of drugs as Deputy Griffin testified in his deposition and at the hearing. And at that time they also determined that the only reason he was remaining on the scene was to get his driver's license checked out. Mr. Dabbs also told you that he was scared while on the scene, that he did not feel as if he was free to leave, so therefore they were detaining him at the time he gave the alleged consent.

Id. at 28.

This brief allusion to an unreasonably long detention during argument on the motion was insufficient to preserve this claim for appeal. Defense counsel never specifically argued that the consent was invalid under the Fourth Amendment because it was the fruit of an illegal detention. It is well-settled in Florida that to preserve an issue for appeal, the specific legal ground upon which a claim is based must be raised at trial and a claim different than that will not be heard on appeal. Chamberlain v. State, 881 So.2d 1087, 1100 (Fla. 2004) (per curiam), cert. denied, 125 S.Ct. 1669 (2005); see also Forrester v. State, 565 So.2d 391, 393 (Fla. 1st DCA 1990) (finding that the defendant failed to preserve the issue of whether the use of a "sniff dog" by police violated his constitutional right to privacy, even though the defendant had claimed in his motion to suppress that use of the dog violated his

rights guaranteed by Fourth, Fifth and Fourteenth Amendments to the United States Constitution, he failed to present the trial court with any specific legal argument on the privacy issue). Accordingly appellate counsel was not ineffective for failing to raise an issue that had not been preserved for appeal.

Even assuming arguendo that the issue was sufficiently preserved, it would have been without merit.

> [T]he Supreme Court [has] concluded that it is unreasonable extensions of the duration--not the scope of conversation--that could render an otherwise justified detention unreasonable for Fourth Amendment purposes. "[M]ere police questioning does not constitute a seizure,"--even if such questioning is about a topic unrelated to the initial purpose of the search or seizure--so long as it does not "prolong[ ] . . . the time reasonably required to complete that [initial] mission." Muehler v. Mena, --- U.S. ----, 125 S.Ct. 1465, 1471, 161 L.Ed.2d 299 (2005) (internal quotations and citations omitted) (holding that no independent reasonable suspicion was required for officers to question person about immigration status while being detained during search for weapons and evidence of gang membership). Although the seizure in Muehler was conducted pursuant to a search warrant, we believe that the focus on duration (and not scope of questioning) is just as applicable to a lawful traffic stop.

> Therefore, arguments that the Trooper asked questions unrelated to either officer safety, the speeding offense, or processing the citation are not determinative of our evaluation of the constitutionality of the seizure here. We are to look only at the duration of the seizure given all the circumstances: was it for an unreasonable time? And, of course, a traffic stop will inherently take some time. When an officer

> is, for instance, looking at a driver's
> license or waiting for a computer check of
> registration, he lawfully can at about the
> same time also ask questions--even questions
> not strictly related to the traffic stop.

United States v. Hernandez, 418 F.3d 1206, 1209 n.3 (11th Cir. 2005).

In this case, the videotape reveals that from the time Deputy Griffin pulled over Petitioner (4:30 a.m.) to the time Petitioner was arrested (4:39 a.m.),[11] approximately nine minutes elapsed. Furthermore, the videotape reveals that at 4:33 a.m., Deputy Griffin asked Deputy McDaniel to run a check on Petitioner's driver's license.  It appears that the results of this check were transmitted to Deputy McDaniels' patrol car radio at approximately 4:37 a.m.[12]  At this point, the initial traffic stop arguably concluded.  The two-minute detention that followed (from 4:37 a.m. to 4:39 a.m.) was clearly reasonable, given the facts of this case. See id. at 1212 n.7 ("we doubt that a resultant seizure of no more than seventeen minutes can ever be unconstitutional on account of its duration: the detention is too short.").

---

[11] As stated previously, Deputy Griffin testified at the evidentiary hearing in state court that Petitioner was under arrest right after Deputy Griffin found the marijuana in the car.  The videotape demonstrates that Deputy Griffin found the marijuana at approximately 4:39 a.m.

[12] Although the transmission at 4:37 is not entirely audible, the officer transmitting the message clearly mentions "Texas," which is the state where Petitioner had been previously arrested on a drug charge.

Furthermore, at the time the results of the license check were transmitted to Deputy McDaniels' patrol car radio, the officers had gathered the following information and/or had made the following observations: (1) Petitioner's car crossed over the middle lane two times before Deputy Griffin pulled him over; (2) the movement of his eyes during the horizontal gaze nystagmus test indicated that he was under the influence of a controlled substance; (3) he told the officers that he was headed to three different destinations, all of which were in the opposite direction he had been traveling; (4) he exhibited odd behavior by tossing his duffle bag in the air several times as he showed it to Deputy Griffin; (5) the tape deck had been pried from the dash board of the car; (6) the vehicle he was driving had been reported to be abandoned; (7) he had a prior arrest for possession of marijuana; (8) he appeared to be nervous; and, (9) Intestate 75 is frequented by drug smugglers, as evidenced by the testimony of Deputy Griffin that numerous drug-related arrests had been made on that interstate highway.

> A traffic stop may be prolonged where an officer is able to articulate a reasonable suspicion of other illegal activity beyond the traffic offense. Purcell, 236 F.3d at 1277. "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification." Illinois v. Wardlow, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (quoting United States v. Sokolow, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989)). When making a

> determination of "reasonable suspicion," we
> must "look at the 'totality of the
> circumstances' of each case to see whether the
> detaining officer has a 'particularized and
> objective basis' for suspecting legal
> wrongdoing." United States v. Arvizu, 534
> U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740
> (2002) (quoting United States v. Cortez, 449
> U.S. 411, 417-18, 101 S.Ct. 690, 66 L.Ed.2d
> 621 (1981)). It is clear that "an 'inchoate
> and unparticularized suspicion' or 'hunch' of
> criminal activity" is not enough to satisfy
> the minimum level of objectivity required.
> Wardlow, 528 U.S. at 124, 120 S.Ct. 673
> (quoting Terry, 392 U.S. at 27, 88 S.Ct.
> 1868).

United States v. Perkins, 348 F.3d 965, 970 (11th Cir. 2003).

Clearly, by the time the officers received the results of the license check, there was an objective basis for reasonably suspecting that Petitioner was under the influence of and/or in possession of a controlled substance. "Once the [deputies] developed this reasonable suspicion, [they] had a duty to investigate more." Hernandez, 418 F.3d at 1211 (citing United States v. Harris, 928 F.2d 1113, 1117 (11th Cir. 1991)). Accordingly, under the circumstances, it was appropriate for the deputies to continue their questioning and to request for permission to search. This claim would not have been successful had appellate counsel raised it on direct appeal. Accordingly, appellate counsel was not ineffective for failing to raise it.

Finally, even assuming arguendo that Petitioner could satisfy both prongs of the Strickland test for ineffective assistance of appellate counsel, the appropriate remedy would be for this Court

to issue a writ of habeas corpus "conditioned upon Florida affording [Petitioner] a new direct appeal" with effective assistance of appellate counsel. <u>Matire</u>, 811 F.2d at 1439. Here, it is clear that the court with jurisdiction to hear this new direct appeal, the First District Court of Appeal, has considered and rejected Petitioner's claim.[13]  Thus, Petitioner was not prejudiced by appellate counsel's failure to raise it on appeal.

Thus, for all of the above-stated reasons, the Second Amended Petition will be denied, and this case will be dismissed with prejudice.

Therefore, it is now

**ORDERED AND ADJUDGED:**

1.   The Second Amended Petition (Doc. #17) is **DENIED**, and this action is **DISMISSED WITH PREJUDICE.**

2.   The Clerk of the Court shall enter judgment denying the Second Amended Petition and dismissing this case with prejudice.

3.   The Clerk of the Court shall close this case.

**DONE AND ORDERED** at Jacksonville, Florida, this _____ day of _____, 2005.

*Howell W. Melton*
HOWELL W. MELTON
United States District Judge

---

[13]   As noted previously, Petitioner filed a petition for writ of habeas corpus with the First District Court of Appeal, in which he presented the same ineffective assistance of appellate counsel claim that he raises here.  That court implicitly found the illegal search and seizure claim to be without merit by summarily denying the petition.

40

ps 9/27
c:
William M. Kent, Esquire
Ass't Attorney General Bryan Jordan